1

2

3

4                            UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    LUKE J. CARRERO,                          Case No.  19-cv-06110-HSG

                    Petitioner,
8
                                               **ORDER DENYING PETITION FOR**
9          v.                                  **WRIT OF HABEAS CORPUS;**
                                               **DENYING CERTIFICATE**
10   DAVID J. HOLBROOK,                         **OFAPPEALABILITY**

                    Respondent.
11

12         Before the Court is the petition for a writ of habeas corpus of Petitioner Luke J. Carrero,

13   brought pursuant to 28 U.S.C. § 2254, challenging the validity of his state court conviction.  Dkt.

14   No. 1.  Respondent has filed an amended answer to the petition, Dkt. No. 23[1], and Petitioner has

15   filed a traverse, Dkt No. 28.  For the reasons set forth below, the petition is DENIED.

16                          **I.      PROCEDURAL HISTORY**

17         On October 16, 2014, Petitioner was convicted by a Santa Clara County jury of one count

18   of oral copulation with a child 10 years of age or younger (Cal. Penal Code § 288.7(b)), three

19   counts of aggravated sexual assault of a child under the age of 14 by oral copulation (Cal. Penal

20   Code § 269), one count of aggravated sexual assault of a child under the age of 14 by sodomy

21   (*id.*), one count of aggravated sexual assault of a child under the age of 14 by rape (*id.*), and six

22   counts of lewd or lascivious acts by force or fear (Cal. Penal Code § 288.7(b)(1)).  Dkt. No. 10-4

23   at 91-116.  The trial court sentenced Petitioner to a term of 90 years to life in prison consecutive to

24   a term of 8 years.  Dkt. No 10-4 at 123.

25         Petitioner appealed his conviction to the California Court of Appeal.  On January 9, 2017,

26

27   _____

28   [1] The Court issued an amended order to show cause after finding Petitioner alleged two additional
     habeas claims.  Dkt. No. 22.  Respondent filed an amended answer, Dkt. No. 23, but relies on the
     state trial record filed with the original answer.  *See* Dkt. No. 10-2 through 10-9.

*United States District Court*
*Northern District of California*

the California Court of Appeal affirmed the judgment of conviction. *People v. Carrero*, No. H041971, 2017 WL 75841, at *1 (Cal. Ct. App. Jan. 9, 2017). The California Supreme Court summarily denied a petition for review on March 22, 2017. Dkt. No. 10-9 at 58.

On or about April 6, 2018, Petitioner filed a federal habeas petition. *Carrero v. Warden* (*Carrero I*), 18-cv-02108-HSG (PR). This Court dismissed the petition for failure to exhaust state remedies. *Carrero I*, Dkt. No. 13 (Feb. 5, 2019).

Petitioner filed a state habeas petition in the Santa Clara County Superior Court, which was denied on August 15, 2018. Dkt. No. 28 at 24. Petitioner's habeas petition was summarily denied by the California Court of Appeal on February 25, 2019, and by the Supreme Court of California on August 14, 2019. *See* Dkt. No. 10-9 at 86-89.

Petitioner filed the instant federal habeas petition on August 19, 2019. Dkt. No. 1.

## II.    STATEMENT OF FACTS

The following factual background is taken from the January 9, 2017 opinion of the California Court of Appeal.[2]

> In March 2010, A. Doe was 10 years old. She lived with her father, defendant, her mother, Melissa, and her younger siblings on Adrien Drive in Campbell. One day, she had a conversation with defendant regarding sex. While defendant told her how children were born, he pulled out his penis and used it to demonstrate. He then grabbed her hand and put it on his penis. She removed her hand. At some point in the conversation, defendant described a "blow job." A. "didn't quite understand what he was saying," so she asked, "Can I try to do it?" Defendant did not stop her when she placed her mouth around his penis. After defendant ejaculated in her mouth, he told her not to tell anyone. She did not tell her mother, because she had been taught to obey her parents. When she disobeyed defendant, he violently beat her.
>
> A. estimated that she put her mouth on defendant's penis more than 10 times. It was not her idea most of the time. However, two or three times, she indicated to defendant that she was willing to do it, because she wanted something in exchange. For example, when she was 11 years old around the time of Halloween, she asked for some candy that she was not allowed to have. He told her, "I'll trade you the candy

---

[2] The Court has independently reviewed the record as required by AEDPA. *Nasby v. Daniel*, 853 F.3d 1049, 1052-54 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of the facts is supported by the record, and that this summary is therefore entitled to a presumption of correctness, unless otherwise indicated in this order.

United States District Court
Northern District of California

for a blow job." She agreed. They went into defendant's bedroom where she placed her mouth on his penis and he ejaculated into her mouth. He later told A. that he would never be attracted to her sister K. because she looked like his mother, but she looked like her mother.

Shortly after the first incident of oral copulation and while the family lived on Adrien Drive, defendant and A. were wrestling in her bedroom. Defendant told her to come with him into the bathroom. Defendant took off his pants and masturbated to ejaculation over the toilet.

On another occasion, defendant put his hands under A.'s shirt and touched her breasts. He also sucked on her breasts. She did not try to pull away from him, because she was afraid that he would hurt her.

In March 2011, A., her parents, and her siblings moved into a home on La Salle Way in San Jose. On one of the occasions in the La Salle Way home when defendant made A. orally copulate him, he held her head and pushed it "forwards and backwards" on his penis. Defendant also orally copulated A. The first time occurred in the bedroom. Defendant, who was not wearing pants or underwear, removed her clothes. As A. lay on the bed, defendant placed his mouth on her vagina and his hands on her breasts. She thought, "[I]f I can get through this, then my sister and brother won't have to." She believed that he orally copulated her twice more. Sometimes when she was engaged in an act with defendant, someone banged on the locked door. She wanted to ask for help, but she "didn't want to get them in trouble."

In 2012, when A. was 12 years old, defendant entered her bedroom with a lubricant and told her that he "wanted to try anal sex." She "was afraid of saying no because of punishment." He removed her clothes and his pants and underwear. As she remained standing, defendant leaned her over onto a bed and penetrated her anus with his penis. It hurt a lot, so she pulled away and told him to stop or she "would tell." The "fear of pain overcame [her] fear of punishment."

On another occasion at the La Salle Way home, A. was in her brothers' bedroom when defendant entered, closed and locked the door, and removed her clothes. Defendant also removed his clothes. While A. was lying on her back on the floor, defendant pushed her legs apart and got on top of her. Defendant pushed his erect penis inside her vagina "just a bit." She told him to stop, because it hurt and she did not want to lose her virginity to someone that she did not love. She also pushed him away and he stopped.

Defendant put his fingers inside A.'s vagina about five times. The pain was "tolerable."

On February 1, 2013, Darin Angelinovich and his girlfriend Erin Graves moved into the La Salle Way house with A. and her family. Angelinovich and defendant had been best friends for 22 years. After Angelinovich moved in, defendant immediately stopped sexually abusing A.

On the evening of February 24, 2013, Angelinovich and defendant

3

were having a discussion about religion. Angelinovich brought up the topic of child molestation "as an example of something that happens, that . . . God doesn't do anything about." Defendant "felt that, no, that's not necessarily justice, but there was an idea that once you go to heaven, further justice could be issued by God." After the conversation ended late that night, Angelinovich and defendant went to their bedrooms.

Melissa had been sleeping and was awakened when she heard defendant crying. She asked him what was wrong. He told her that there was child pornography on his computer and talked about "doing stuff with" A. Melissa began crying, did not want to hear what defendant was saying, and went to find Angelinovich. She told Angelinovich that defendant had said that he had touched A. Angelinovich sat there for a few minutes in disbelief and tried to console her.

Angelinovich spoke to defendant, who seemed very distraught. Defendant told him that he had convinced A. "to give him blow jobs" and he "went down on her a few times" over a period of about one year. Defendant also told him that there were about 10 incidents.

After talking with Melissa, Angelinovich called the police. The police arrived within 15 to 20 minutes. Angelinovich and a police officer entered A.'s room. The officer asked her if her father had ever touched her in a sexual way. A. answered yes, but did not give details. She thought that she was "finally free."

When Melissa returned to her bedroom, she found a letter from defendant on the bed. It read: "You are it all. Without you I am nothing. What little I have is yours. Please forgive me. I was stupid, so stupid. Give me one last chance. Let me be true to you. Let me save what's left. I've come to realize you are my everything, such is why I would confess, break your heart. Because didn't deserve any less. I know nothing excuses what I've done, but I do hope that you'll forgive me. Hope for your forgiveness. All I have left. Let me be your moon and stars again because I know you are mine. Over the years I've learned you are what's important. You are my world. Every day I wake . . . I cry a little because you're not awake with me. Love, Luke." Melissa gave the letter to the police.

After A. had revealed to the police what had happened, her behavior became worse. She did not do her chores, was not nice to her siblings, did not always tell the truth, treated her friends "terribly," and did not listen to her teachers. She started acting out, because her mother "made it all about her" and "ignored and neglected" her. A. "wanted somebody to notice that [she] was in pain and needed help." She was in therapy, but it did not help. She was placed in a group home for a short period. She eventually moved to Texas where she currently lives with her aunt, Christine W., her uncle, and K.

Dr. Anthony Urquiza testified as an expert in the Child Sexual Abuse Accommodation Syndrome (CSAAS). Dr. Urquiza stated that CSAAS is not a diagnostic tool and he did not know the facts of the present case. He explained that the purpose of CSAAS is to educate therapists and jurors about the common characteristics of child sexual

4

abuse and dispel misperceptions that they may have.  According to Dr. Urquiza, most children are sexually abused by someone that they know.  He listed and described the five categories of CSAAS, which are: secrecy; helplessness; entrapment and accommodation; delayed and unconvincing disclosure; and retraction or recantation.

*Carrero*, 2017 WL 75841, at *1-3.

## III.    DISCUSSION

### A.    Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court making

the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).[3]  In reviewing each claim, the court must examine the last reasoned state court decision that addressed the claim. *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

When a federal claim has been presented to a state court and the state court has summarily denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (one-sentence order denying habeas petition analyzed under § 2254(d)).  Accordingly, in reviewing the habeas claims not addressed by the state appellate court, this Court follows the Supreme Court's direction and "determine[s] what arguments or theories . . . could have supported" the California Supreme Court's rejection of the federal claim, and then gives deference to those arguments or theories under AEDPA.  *Id.* at 102.

### B.    Petitioner's Claims

Petitioner raises the following nine claims in this federal habeas petition:  (1) judicial bias, (2) denial of due process and a fair trial because Petitioner was unable to assist with his defense due to severe sleep deprivation caused by the jail's schedule for sleeping and transport to court; (3) denial of his right to present a complete defense because of evidentiary rulings; (4) cumulative error; (5) ineffective assistance of counsel at sentencing; (6) ineffective assistance of counsel for failing to raise or explore the above grounds as bases for challenging his conviction; (7)

---

[3] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default.  *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).

United States District Court
Northern District of California

ineffective assistance of counsel for failure to inform the trial court of the unconstitutional

conditions in Santa Clara County Jail and for failure to object to the trial judge's clear bias; (8)

biased jury; and (9) the sentence constituted cruel and unusual punishment in violation of the

Eighth Amendment.

Respondent asserts that the instant Petition is subject to dismissal as untimely.  However,

because the possible tolling issue in this case may present disputed issues of fact, whereas the

merits of Petitioner's claims are relatively straightforward on the existing record, the court will

exercise its discretion to make a determination on that basis.  *See Flournoy v. Small*, 681 F.3d

1000, 1004 n.1 (9th Cir. 2012) ("While we ordinarily resolve the issue of procedural bar prior to

any consideration of the merits on habeas review, we are not required to do so when a petition

clearly fails on the merits."); *Van Buskirk v. Baldwin*, 265 F.3d 1080, 1083 (9th Cir. 2001) (court

may properly deny petition on merits rather than reach issue of time bar under AEDPA).

### 1.    **Claim No. 1: Judicial Error**

In Claim No. 1, Petitioner contends that he was subject to judicial bias when the judge

failed to limit the scope of questioning of the prosecution's expert witness.  Dkt. No. 1 at 20.

Petitioner also contends that the trial judge made improper comments in open court with respect to

the number of victims, and Petitioner's right to testify.  *Id.*  Petitioner asserts that he was

prevented from presenting a complete defense when his trial counsel's questioning was improperly

halted.  *Id.*  Finally, Petitioner claims that the judge could have provided him additional

preemptory challenges but failed to do so.  *Id.*  The California Supreme Court and California

Court of Appeal summarily rejected this claim.  The state superior court rejected this claim as

follows:

> Petitioner complains that the trial court's judicial bias denied him the
> right to a fair trial and due process of the law.  Specifically, he claims
> that the court limited the scope of an expert witness's testimony and
> then overruled defense counsel's repeated objections that the
> prosecutor's questioning was outside of the limited scope.  He also

states that, after his trial, the court stated that multiple victims were involved when only one victim was actually involved and that, at some point the court stated that Petitioner "forced" the victim to testify. At one point, the court also interrupted trial counsel's cross examination of a witness and then prevented counsel from continuing that line of questioning. Finally, Petitioner argues that the court could have given him additional peremptory challenges in order to ensure him a fair jury trial but it did not do so.

Petitioner has not provided a transcript of the proceedings from which the court could determine the exact nature of the testimony and objections. [FN] But, it has been repeatedly held that "a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112; *People v. Avila* (2009) 46 Cal.4th 680, 696.) With respect to any comment the court may have made about multiple victim's being involved, it is not clear how such a comment, made after trial could have prejudiced Petitioner. (*See People v. Woodruff* . . . 2018 WL 3469067, at p. *40] (*Woodruff*) ["alleged instances of judicial misconduct occurred outside the presence of the jury and thus could not have prejudiced defendant"].) With respect to any comment the court may have made regarding multiple victims, it is not clear if that comment was made before the jury. In any event, the jury would have heard testimony regarding only one victim and Petitioner did not suffer any additional punishment that could have been imposed due to the involvement of multiple victims. Thus, it does not appear that Petitioner would have suffered any prejudice as a result of that comment. Finally, the number of peremptory challenges granted to a defendant is set by statute, (Pen. Code, § 231, subd. (a)), and the·court did not display judicial misconduct by failing to grant additional peremptory challenges.

Petitioner "'fails to demonstrate any judicial misconduct or bias, let alone misconduct or bias that was 'so prejudicial that it deprived defendant of ' " 'a fair, as opposed to a perfect, trial.' " ' " (*Avila*, *supra*, 46 Cal.4th at p. 696, quoting *Guerra*, *supra*, 37 Cal.4th at p. 1112.) [A]ccordingly, Petitioner's claims of judicial bias lack merit.

Dkt. No. 30 at 5.

The state's court's denial of this claim was not objectively unreasonable. The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *See In re Murchison*, 349 U.S. 133, 136 (1955); *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1990). A "biased decisionmaker [is] constitutionally unacceptable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

On federal habeas review of a state conviction, judicial misconduct will warrant habeas relief only where "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d

734, 740 (9th Cir. 1995). To succeed on a judicial bias claim, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47; *Rhoades v. Henry*, 598 F.3d 511, 519 (9th Cir. 2010) ("There is a strong presumption that a judge is not biased or prejudiced . . ."). "In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases.'" *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Indeed, bias can "almost never" be demonstrated solely on the basis of a judicial ruling. *Liteky*, 510 U.S. at 555.

### a.   Objection to Expert Testimony

Petitioner first alleges that the trial court displayed bias when it overruled three defense objections to the testimony of the state's expert, Dr. Urquiza, as outside the scope. Prior to trial, the judge granted the state's request to introduce expert witness Dr. Urquiza to testify about Child Sexual Assault Accommodation Syndrome. During Dr. Urquiza's testimony, defense counsel objected to the state's question as follows:

> [PROSECUTOR]. In terms of when they actually do come forward and talk, based on your experience, does the average child just lay everything out, every single incident in great detail that first time that they reveal something's been happening to them?
>
> [DEFENSE COUSNEL]: Objection, Your Honor. This is outside the scope.
>
> THE COURT: Overruled.

Dkt. No. 10-6 at 41.

> The second exchange was as follows:
>
> [PROSECUTOR]. You talked earlier about how children can just accommodate. They can't change it. They're helpless. It's a secret, so they accommodate what is happening to them. Based on your training and experience, once the abuse is out in the open, the secret is out, do most of the children that you've dealt with at that point just adjust and that's the end of it? They go on and lead normal happy lives?
>
> [DEFENSE COUNSEL]: Objection. Outside the scope.
>
> THE COURT: Overruled.

United States District Court
Northern District of California

*Id*. at 46-47.

The third exchange was as follows:

[PROSECUTOR].  Again back to the scenario of accommodation.  You talked about earlier that the kid, while the abuse is ongoing, may be able to for years, if it's an ongoing yearly, you know, abuse that's going on yearly for all outward appearances be living a normal life, interact with the perpetrator as if nothing is amiss.

Based on your training and experience, have you run across the scenario where once the secret is out, that the converse of what we just talked about where the child just goes about -- doesn't want to talk about it, the converse being where the child at that point just completely falls apart?

[DEFENSE COUNSEL]:  Objection.  Calls for improper opinion.  Outside the scope.

THE COURT:  I'm going to sustain it, but I'll let you rephrase.

[PROSECUTOR]:  Okay.

[PROSECUTOR]:  Again talking about your practice with the thousand or so children you treated, did you come across, in the course of your career, the child who, even though they may have accommodated what was happening to them for years, once the secret is revealed absolutely falls apart?

[DEFENSE COUNSEL]:  Same objection.

THE COURT:  Overruled.

*Id*. at 48-49.

After a careful review of the record, Petitioner fails to overcome the strong presumption that the trial court was not biased.  The judicial rulings, even if erroneous (a fact which Petitioner has failed to demonstrate) are insufficient to support a claim of judicial bias.  *See Liteky*, *supra*, 510 U.S. at 555 ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion."); *United States v. Johnson*, 610 F.3d 1138, 1148 (9th Cir. 2010) ("Adverse findings do not equate to bias.").

b.    Cross-Examination of Darin Angelinovich

Petitioner also alleges that the trial court displayed bias when it halted defense counsel's cross-examination of prosecution witness Darin Angelinovich.  During cross-examination, defense counsel began questioning Angelinovich about possible motives for him to testify falsely against

10

Petitioner.  The prosecutor asked to approach the bench, and a conversation was held off the record.  Defense counsel continued to cross-examine the witness with less targeted questions.  The exchange was as follows:

> Q [DEFENSE COUNSEL].  It's your testimony that you were best friends with Mr. Carrero; is that --
>
> A [ANGELINOVICH].  Yeah.  Okay.  I'm sorry.  That was yes. That's --
>
> Q.  In fact, I think the phrase lifelong friend was used; is that --
>
> A.  I'd say that's pretty accurate, yeah.
>
> Q.  And in fact -- well, it's your testimony that as a result, you don't have any reason to lie about what happened or what he may or may not have said to you?
>
> A.  No.
>
> Q.  You don't harbor any malicious or negative feelings toward him that would cause a bias against him?
>
> A.  Harboring -- I'm upset that what happened, and I'm upset that there's a loss of friendship.
>
> Q.  Okay.  Isn't it true also that you had spent years trying to dismantle the relationship between Mr. Carrero and Melissa?
>
> A.  No.
>
> Q.  And that you had attempted to prevent them from getting married?
>
> A.    At a moment when they were getting married there was conversations between Luke and myself on his relationship with Melissa.  And when they got married -- or okay.
>
> In Christianity you're not supposed to sleep with somebody before you get married.  The idea is to wait 'til marriage.
>
> He had told me if they had done that one more time that he was going to break up -- break up with her in the relationship.  He did do that one more time, and being as involved in the Christian church as I was, I did encourage -- I said, "Well, this relationship should probably end. You should probably live up to your word as far as not going through the relationship."
>
> Q.  In fact, you actually approached Mr. Carrero about his attraction and his feelings for you prior to them getting married?
>
> A.  No.
>
> Q.  Okay.  And after they were married, they went to Oregon; is that

11

right?

A.  Yeah.

Q.  And when they returned, you confronted Mr. Carrero by letter, warning him that you had --

[THE PROSECUTOR].  Your Honor, can we approach, please?

THE COURT.  Yes.

(Whereupon, a discussion was had off the record.)

Q [DEFENSE COUNSEL].  Let me ask you, Mr. Angelinovich, whether you harbor any negative feelings against Mr. Carrero for continuing his relationship with Melissa and not engaging in a relationship with you?

A.  I was never at any point in desire with him having a relationship with me.  That was never the case.  And after, you know, we talked, I think it was when I went up to visit the two of them in Oregon after A[.] was born.  I held no ill feeling towards the two of them being married.

[DEFENSE COUNSEL]:  Thank you.  Your Honor, I have no further questions.

Dkt. No. 10-6 at 139-41.

Once again, Petitioner fails to overcome the strong presumption that the trial court was not biased.  First, there is no record of the exchange, nor what precise judicial ruling was made.  In any event, even assuming the judge halted the line of questioning, the judicial ruling, even if erroneous, is insufficient to support a claim that the judge was biased against Petitioner.  *See Larson*, *supra*, 515 F.3d at 1067 ("[i]n the absence of evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity") (citations omitted); *see also Liteky*, 510 U.S. at 555.

c.    Comment on Multiple Victims

Also without merit is Petitioner's allegation that the judge displayed bias by referring to the multiple victims in this case.  At sentencing, after the prosecutor read the victim impact letters, the judge stated: "[T]hank you for reading those letters.  I know that the victims could not be present today, and I say victims because I do think that the family members that are dealing with this are actual victims of this crime as well."  Dkt. No. 10-7 at 101.  To the extent Petitioner is

12

arguing that the judge's comment impacted his sentencing, that claim lacks merit.  *See United States v. Rangel*, 697 F.3d 795, 804–05 (9th Cir. 2012) ("Expressing sympathy for the victims' plight . . . in no way implies that the district court judge could not and did not impartially impose a sentence.")  There is simply nothing to indicate that the judge imposed a different sentence based on that comment.  To the extent Petitioner is arguing that the comment at sentencing negatively impacted the trial, as the state court noted, Petitioner fails to demonstrate how a comment made by the judge after trial could have prejudiced the defendant at trial.  *See Duckett*, 67 F.3d at 740.  Finally, to the extent Petitioner is arguing that the judge's comments showed that the judge should have recused himself, that claim also lacks merit.  *See Liteky*, 510 U.S. at 550-51 ("The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person.  But the judge is not thereby recusable for bias or prejudice . . ."); *United States v. Holland*, 519 F.3d 909, 914 (9th Cir. 2008) (a "judge's conduct during the proceedings should not, except in the 'rarest of circumstances' form the sole basis for recusal.") (*quoting Liteky*, 510 U.S. at 555).

### d.    Comment on Plea Deal

Petitioner also alleges that the judge displayed bias by insinuating that because Petitioner did not accept a plea deal, he forced the victim to testify.  At sentencing, the judge stated: "I have no idea what would go through Mr. Carrero's head that would create this situation for his own daughter.  I absolutely recognize a constitutional right to a jury trial, and I do not and will not punish someone for that.  However, there is something to be said of forcing this child to go through testifying about these circumstances . . ."  Dkt. No. 10-7 at 102-03.  Once again, Petitioner fails to overcome the presumption against judicial bias.  *See Rhoades*, 598 F.3d at 519.  The judge made clear that he was not punishing Petitioner for deciding to go to trial, and sentenced Petitioner in accordance with the probation department's recommendations: "I am in agreement with probation's recommendations and will follow them."  Dkt. No. 10-7 at 102-03.

### e.    Peremptory Challenges

Finally, Petitioner's allegation that the judge displayed bias by failing to award him additional peremptory challenges does not merit habeas relief.  As explained by the state court, the

United States District Court
Northern District of California

13

1   number of peremptory challenges is set by statute.  *See Ross v. Oklahoma*, 487 U.S. 81, 89 (1988)

2   ("Because peremptory challenges are a creature of statute and are not required by the Constitution,

3   it is for the State to determine the number of peremptory challenges . . . [a]s such, the "right" to

4   peremptory challenges is "denied or impaired" only if the defendant does not receive that which

5   state law provides.") (citation omitted); *Bonin v. Vasquez*, 794 F. Supp. 957, 975 (C.D. Cal. 1992)

6   (failure of state trial court to grant petitioner additional peremptory challenges not constitutional

7   violation where he received all peremptories entitled to under state law) (*aff'd sub nom. Bonin v.*

8   *Calderon*, 59 F.3d 815 (9th Cir. 1995)).

9           After reviewing the record with respect to Petitioner's claims of judicial bias, this Court

10   has discerned no judicial conduct rendering Petitioner's trial "so fundamentally unfair as to violate

11   federal due process . . ."  *See Duckett*, 67 F.3d at 740.  Accordingly, the state court's rejection of

12   Petitioner's judicial bias claim was not contrary to or an unreasonable application of Supreme

13   Court precedent or an unreasonable determination of the facts.  Petitioner is not entitled to habeas

14   relief on Claim No. 1.

15                  2.         **Claim No. 2: Sleep Deprivation**

16           In Claim No. 2, Petitioner argues that the conditions in the county jail — including sleep

17   deprivation and lack of showers or razors — rendered him unable to assist in his defense, denying

18   his right to a fair trial under the Due Process Clause.  Specifically, Petitioner alleges that had he

19   not been sleep deprived he would have testified at trial, would have provided opinions on defense

20   strategies, and would have responded to counsel's questions about jurors.  Dkt. No. 1 at 23.  The

21   California Supreme Court and state appellate court summarily denied this claim.  The state

22   superior court rejected this claim as follows:

23                  Petitioner argues that lack of sleep due to the transportation and
                    showering schedule at Elmwood Correctional Facility, where he was
24                  housed during his trial, contributed to his inability to assist in his own
                    defense.  He states that he was unable to obtain eight hours of sleep
25                  per night for over one year while he was held in custody prior to trial.
                    He argues that, during jury selection, he was unable to respond to his
26                  trial counsel's questions.  Generally, courts reviewing habeas corpus
                    petitions are not required to, and do not, accept uncorroborated, self-
27                  serving, and convenient after the fact assertions.  (*See In re Alvarnaz*
                    (1992) 2 Cal.4th 924, 938; *People v. Barella* (1999) 20 Cal.4th 261,
28                  272; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1260; *People v. Hunt*

United States District Court
Northern District of California

14

(1985) 174 Cal.App.3d 95, 103, citing *People v. Brotherton* (1966) 239 Cal.App.2d 195, 201.)

But, even accepting his uncorroborated statements as true, Petitioner points to no prejudice that occurred as a result of the sleep deprivation. In other words, although he states that he was unable to meaningfully participate in jury selection, he does not argue that any error occurred as a result. Even now that he has presumably had the benefit of appropriate sleep for more than a year since his trial ended, Petitioner does not articulate what prejudice, if any, he suffered as a result of the sleep deprivation he suffered during trial. Finally, Petitioner fails to show that he informed the court of these conditions at the time they occurred. (*See, e.g.*, (*People v. Lucero* (2000) 23 Cal.4th 692, 716 (*Lucero*) [rejecting sleep deprivation argument where the defendant "never asked the trial court to postpone the trial to give him additional time to sleep"].) Accordingly, Petitioner's conviction cannot be disturbed on this ground.

Dkt. No. 30 at 6-7.

The state courts' rejection of this claim was not objectively unreasonable. First, Petitioner does not present, nor is this Court aware of any Supreme Court case which holds that a defendant's sleep deprivation during the time of trial renders a trial fundamentally unfair. *See Harrington*, 562 U.S. at 101 ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citation omitted) (alteration in original). Second, as the state court reasonably concluded, Petitioner fails to show "actual prejudice", *i.e.*, that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted). Petitioner makes broad assertions claiming that had he not been sleep deprived he would have testified and participated in defense strategy. However, he fails to articulate how this would have changed the outcome of trial, and the evidence implicating Petitioner in the sexual crimes was overwhelming. At trial, A. gave an extremely detailed account of the many sexual encounters between Petitioner and herself. Angelinovich recounted his conversation with Petitioner about touching A.: "[Petitioner] told me that he had convinced A[.] to give him blow jobs, and that [he] had -- and he in turn went down on her a few times" for about a year. Dkt. No. 10-6 at 136. Petitioner's wife testified that Petitioner stated he had done things

United States District Court
Northern District of California

with A. and she provided a copy of the letter Petitioner left her shortly before he was arrested, in

which he wrote "nothing excuses what I've done, but I do hope that you'll forgive me." *Id*. at

156-57.  Thus, as the state court concluded, Petitioner fails to show prejudice from his alleged

sleep deprivation.  Because the state court's decision denying this claim was neither contrary to

nor an unreasonable application of Supreme Court precedent or an unreasonable determination of

the facts, Petitioner is denied relief on Claim No. 2.

### 3.     Claim No. 3: Right to Present a Complete Defense

In Claim No. 3 Petitioner argues that he was denied his right to present a complete defense

when the trial judge halted defense counsel's cross-examination of Angelinovich.  Dkt. No. 1 at

24.  Petitioner argues that his counsel's line of questioning sought to uncover Angelinovich's

ulterior motives and impartiality in testifying against Petitioner.  *Id*.  The relevant testimony is laid

out in Section IIIB1b, above.  The California Supreme Court and the California Court of Appeal

summarily denied this claim.  The state superior court rejected this claim as follows:

> Petitioner argues that, during cross examination of a witness, Mr.
> Darin Angelinovich, the trial court interrupted defense counsel's
> questioning and "halted trial counsel's line of questioning."  He claims
> that defense counsel was attempting to show Mr. Angelinovich's
> "ulterior motives and questioning his impartiality and integrity."
> Again, Petitioner has failed to provide a transcript of the proceedings
> or even to explain the context of the testimony.
>
> " ' As a general matter, the "[a]pplication of the ordinary rules of
> evidence ... does not impermissibly infringe on a defendant's right to
> present a defense." ' " (*People v. Foss* (2007) 155 Cal.App.4th 113,
> 130, quoting *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103
> (*Fudge*).)  Assuming that the trial court's ruling was error, it appears
> that any error would have been harmless.  "Although completely
> excluding evidence of an accused's defense theoretically could rise to
> this level, excluding defense evidence on a minor or subsidiary point
> does not impair an accused's due process right to present a defense.
> [Citation.]  If the trial court misstepped, '[t]he trial court's ruling was
> an error of law merely; there was no refusal to allow [defendant] to
> present a defense, but only a rejection of some evidence concerning
> the defense.' [Citation.]  Accordingly, the proper standard of review
> is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836
> [(*Watson*)] and not the stricter beyond-a-reasonable-doubt standard
> reserved for errors of constitutional dimension (*Chapman v.
> California* (1967) 386 U.S. 18, 24[]).'"  (*Fudge, supra*, 7 Cal.4th at p.
> 1103.)

16

Here, the record reveals that Mr. Angelinovich was sworn as a witness at 3:23 p.m. on the fifth day of jury trial and that his testimony, including cross-examination, was completed by 4:08 p.m., when the People rested their case. Petitioner argues that he was denied the ability to question Mr. Angelinovich's credibility during that relatively brief testimony. But, the victim, who was the only percipient witness to the events, testified. Petitioner's wife, to whom he confessed his conduct, also testified. (*Carrero*, *supra*, (Jan. 9, 2017, No: H041971).) Thus, there was other evidence, in addition to Mr. Angelinovich's testimony, from which the jury could have concluded Petitioner was guilty of the charged crimes. Mr. Angelinovich's only connection to the crime was that Petitioner also confessed his actions to him. (*Ibid.*) Accordingly, Petitioner has not shown that it is "reasonably probable that a result more favorable to [Petitioner] would have been reached in the absence of" the trial court's ruling. (*Watson*, supra, 46 Cal.2d at p. 836.) Accordingly, Petitioner's claim lacks merit.

Dkt. No. 30 at 7-8.

The state court's rejection of this claim was not objectively unreasonable. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). In limited circumstances, however, the exclusion of crucial evidence may violate the Constitution. *See Holmes v. South Carolina*, 547 U.S. 319, 319 (2006) ("[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense") (citations and internal quotations omitted); *Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004) ("The Supreme Court has made it clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense.") (citations and internal quotations omitted). Nevertheless,

[w]hile the Constitution [ ] prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Holmes*, 547 U.S. at 326. Thus, the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." *See Washington v. Texas*,

388 U.S. 14, 16 (1967); *United States v. Evans*, 728 F.3d 953, 966 (9th Cir. 2013) (explaining that a violation occurs where the trial court excludes the sole or main piece of evidence for the defendant's main defense to a critical element of the government's case.)  Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve."  *Holmes*, 547 U.S. at 324 (internal citation and quotation marks omitted).  A violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict.  *See Lunbery v. Hornbeam*, 605 F.3d 754, 762 (9th Cir. 2010) (citing *Brecht*, 507 U.S. at 637-38).

The testimony of Angelinovich was not vital to the state's case, nor was the defense strategy of revealing his motives to lie vital to the defense.  *See Washington v. Texas*, 388 U.S. at 16.  As the state court reasonably concluded, Angelinovich's testimony was limited, mostly cumulative of Petitioner's wife's testimony, and ancillary to A.'s testimony detailing the events.  Thus, Petitioner fails to show how limiting the cross-examination had a substantial and injurious effect on the verdict.  *See Brecht*, 507 U.S. at 637-38.  Furthermore, a review of defense counsel's closing remarks shows that the defense was not precluded from attacking Angelinovich's credibility:

> We turn also to Darin Angelinovich's testimony.  And I asked him about harboring malicious feelings towards Mr. Carrero about a relationship, and certainly he denied anything like that.  But frequently it's not the questions I ask or the responses that you hear, but it's the demeanor that you can observe and similarly when they're responding to a question.
>
> And I certainly think that it's fair to describe -- to represent his testimony as suspect, as unusual, as defensive.  Again we can't endeavor to know what's going on in his mind or between the two of them because we heard him testify for ten minutes, 15 minutes.  But we can sense by our experience and our intuition that from his testimony we know that there's something there, and we know that that something should call into question the reliability of his testimony of the things that he's asking you to make important decisions about.  And so, I mean, you incorporate that into the difficult analysis in this case.

Dkt. No. 10-7 at 63-64.

For these reasons, the state court's decision denying this claim was neither contrary to nor

an unreasonable application of Supreme Court precedent or an unreasonable determination of the

facts.  Petitioner is denied relief on Claim No. 3.

4.      **Claim Nos. 5 through 7: Ineffective Assistance of Trial and Appellate Counsel**

In Claim No. 5, Petitioner asserts that his counsel was ineffective in failing to object to the

court's remarks at sentencing about multiple victims and Petitioner forcing the victim to testify.

Dkt. No. 1 at 25.  In Claim No. 6, Petitioner asserts that his appellate counsel was ineffective in

failing to raise the issues raised in this petition.  *Id*. at 26.  In Claim No. 7, Petitioner reasserts that

his trial counsel was ineffective in failing to object to "the Judge's clear bias as noted in [Claim]

One" and failing to "bring to the Court's attention the Unconstitutional Conditions in Santa Clara

County Jail as noted by the Petitioner in [Claim] Two, despite being so informed".  *Id.* at 26.  The

California Supreme Court and the California Court of Appeal summarily denied these claims.  The

state superior court rejected the claims as follows:

> Petitioner argues that he received ineffective assistance of both trial counsel and appellate counsel. " 'To prevail on a claim of ineffective assistance of counsel, defendant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." ' [Citation.]  Prejudice occurs only if the record demonstrates 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]" (*Lucero*, *supra*, 23 Cal.4th at p. 728.)
>
> With respect to trial counsel, he argues that counsel failed to object to two comments he alleges were made by the court: (1) that Petitioner's actions affected more than one victim and (2) that Petitioner forced the victim to testify.  Petitioner argues that counsel should have requested a mistrial or requested a new judge be assigned for sentencing.  Petitioner indicated in his previous claim of error that the court allegedly made those comments after trial so counsel would have no grounds to request a mistrial on the basis of the comments. (*See Woodruff*, *supra*, [ ][(July 19, 2018, No. Sl15378) 2018 WL 3469067, at 6 p.*40].)
>
> With respect to appellate counsel, Petitioner argues that counsel failed to include in his direct appeal the issues raised in the petition and that he informed appellate counsel that "the conditions of the County Jail did not seem right" and that counsel did not include that issue in his appeal nor did he enquire further into the matter.  To the extent Petitioner argues counsel was ineffective for failing to raise the issues

> contained in the instant petition, this court finds that none of Petitioner's claims of error in the instant petition are meritorious and thus, counsel is not ineffective for failing to raise them. "Failure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.) With respect to the jail conditions, Petitioner fails to state what "did not seem right" about the jail conditions. Assuming that he is referring to the sleep deprivation claim made in the instant petition, this court has already concluded that that claim is without merit. Accordingly, Petitioner's claims of ineffective assistance of counsel lack merit.

Dkt. No. 30 at 8-9.

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a defendant must establish two things. First, the defendant must establish "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. Second, the defendant must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* 694. On habeas review, it is not enough for a federal court to find counsel ineffective. The federal court must also find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington*, 562 U.S. at 101.

a. Sentencing

In Claim No. 5 Petitioner asserts that trial counsel was ineffective in failing to object to the court's remarks at sentencing. As discussed earlier, in Section IIIB1, there is nothing to indicate that the judge's comments rendered the trial or sentencing unfair. Insofar as there was no underlying judicial bias, any objection by Petitioner's counsel would have lacked merit. Counsel's failure to raise a meritless objection does not support a finding of ineffective assistance of counsel. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance."); *James v. Borg*, 24 F.3d 20, 26-27 (9th Cir. 1994) (counsel's failure to make what would be a futile motion does not qualify as ineffective assistance of counsel).

1

b.      Appellate Counsel

2      In Claim No. 6, Petitioner asserts that appellate counsel was ineffective in failing to raise

3  Claims Nos. 1 through 5 on appeal.[4]  Claims of ineffective assistance of appellate counsel are

4  reviewed according to the standard set out in *Strickland*.  First, the petitioner must show that

5  counsel's performance was objectively unreasonable, which in the appellate context requires the

6  petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-

7  worthy issue.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Second, the petitioner must show

8  prejudice, which in this context means that the petitioner must demonstrate a reasonable

9  probability that, but for appellate counsel's failure to raise the issue, the petitioner would have

10  prevailed in his appeal.  *Id.* at 285-86.  Appellate counsel does not have a constitutional duty to

11  raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54

12  (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of

13  effective appellate advocacy.  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

14      The state court's rejection of this claim was not unreasonable.  With respect to the claims

15  raised in the instant petition, the Court has found them to be without merit.  Thus, even if

16  Petitioner could demonstrate that the failure to raise these claims was objectively unreasonable,

17  Petitioner cannot show prejudice.  The Court's denial of these claims on the merits indicates that

18  the failure to prevail in his appeal was not due to appellate counsel's failure to raise these claims.

19

c.      Judicial Bias and Sleep Deprivation

20      In Claim No. 7, Petitioner asserts that trial counsel was ineffective in failing to object to

21  the many instances of judicial bias, as raised in Claim No. 1, as well as failing to raise with the

22  trial court the conditions in Santa Clara County Jail, as raised in Claim No. 2.  As discussed in

23  Sections IIIB1, there is nothing to indicate that Petitioner's constitutional rights were violated by

24  any alleged judicial bias.  Thus, insofar as there was no underlying constitutional violation, any

25  objection by Petitioner's counsel would have lacked merit.  *See Rupe*, 93 F.3d at 1445.  With

26  respect to the conditions in Santa Clara County Jail, as discussed in Section IIIB2, Petitioner fails

27

28

_____

[4] Claim No. 4 is a claim of cumulative error, addressed in Section IIIB7, below.

United States District Court
Northern District of California

1    to show prejudice.  *See Strickland*, 466 U.S. at 694.  Even had counsel raised the issue with the

2    trial judge, Petitioner fails to show how the proceeding would have been different.  *Id*.  The

3    evidence against Petitioner was overwhelming — including the account of A. which was generally

4    corroborated by Petitioner's statements to other witnesses.

5         For these reasons, the state court's decision denying these claims was neither contrary to

6    nor an unreasonable application of Supreme Court precedent or an unreasonable determination of

7    the facts.  Petitioner is denied relief on Claim Nos. 5 through 7.

                    5.    **Right to Impartial Jury**

9         In Claim No. 8, Petitioner alleges that he was denied his right to a fair and impartial jury

10   when the trial court denied his challenge for cause to Juror No. 1611107, after he had exercised all

11   his peremptory challenges.  Dkt. No. 1 at 49.  The California Supreme Court summarily denied

12   this claim.  The California Court of Appeal rejected this claim as follows:

         A. Right to Impartial Jury

14       Defendant contends that the trial court erred when it denied his
         challenges for cause to prospective Juror No. 1565015, Juror No.
15       1611107, and prospective Juror No. 1734245.  Defendant exercised
         peremptory challenges to prospective Juror Nos. 1565015 and
16       1734245.   However, since defendant had exhausted his peremptory
         challenges, Juror No. 1611107 remained on the jury.  Thus, he
17       contends that he was deprived of his constitutional right to trial by an
         impartial jury.  We conclude that the trial court did not err when it
18       denied defendant's for-cause challenge to Juror No. 1611107, and
         thus he is not entitled to reversal of the judgment.

         1. Background

21       On the third day of jury selection, Juror No. 1611107 was called.
         Shortly thereafter, outside the presence of the venire, the trial court
22       considered whether to order an additional jury panel.  The prosecutor
         stated: "I know, just reading, we're going to lose two that are in that
23       six right now who are just going to say they cannot be fair.  There's
         just no rehabilitating (1384849) and (1611107)."

24       After a recess, the trial court asked questions of the prospective jurors,
         including whether they could decide the case based on the facts and
25       evidence, and not allow "bias, sympathy, prejudice, or public opinion
         influence" their decision.  Juror No. 1611107 responded, "I think if
26       you put the kid up there and whatever she says, I'm going to go with
         it because she's the one it happened to allegedly."  The following
27       exchange occurred: "THE COURT: Okay.  Well, so you make a good
         point in adding the 'allegedly' at the end there.  You haven't heard
28       the testimony in this case.  You've heard the charges, and it's not—

the witnesses are not the one who bring the charges.  It's the state, right?  It's the district attorney's office that brings charges. [¶] So witnesses are going to come up, and they're going to talk about whatever they're going to testify about.  At the end of that testimony, after you've heard both sides have an opportunity to present testimony, the defense if they so choose—because they don't have to present any testimony, but they'll have an opportunity to cross-examine witnesses.  Your job really is to say, okay, now I'm going to go back with 11 other people, talk about this case, and go count by count and determine factually did this happen and applying those facts to the law as I give it to you. [¶] So you also have not heard yet the factors or the elements of the crimes in this case.  So for every crime there's certain elements the district attorney has to prove.  Your job's going to be to apply the facts to the charges and say, okay, beyond a reasonable doubt or not.  Do you think you can do that?  I mean, setting aside—I know you might have some feelings or just hearing the charges, but getting to a point where you can say I'm going to discuss this and say fact by fact did they prove this charge?  Okay.  Let's move onto the next one.  Did they prove this charge?  Can you do that and really have a process of deliberation? [¶] PROSPECTIVE JUROR: Yeah, I think I could and I understand the process.  For me, it's a little different when it's a kid. [¶] THE COURT: And I think that's probably a normal feeling for most people.  It's just a question of whether or not you're going to want to sit here and listen to it.  It's a different question than can I participate in this process.  Am I up to the task of really listening to what's being said on both sides, on direct—on direct examination, all witnesses together, take all of that evidence and try to determine what factually happened. [¶] PROSPECTIVE JUROR: Yeah.  I just—personally don't think I would be fair in my decision. [¶] THE COURT: Okay.  So you don't think you could do that? [¶] (The juror shakes head from side to side.)"

Juror No. 1611107 was a single real estate agent who lived with his mother and stepfather.  A close family member had been sexually abused 34 years earlier by "someone close like a family member."  Juror No. 1611107 had "feelings" about "the consequences of what happened to that person," but he stated that he could separate out what he heard in that case and "give a fair trial in this case."

Defense counsel questioned Juror No. 1611107. "[DEFENSE COUNSEL]: Good afternoon.  A long day.  Mr. (1611107), I want to follow up on a couple things that you've talked about this afternoon.  Specifically, your statement that you felt that you couldn't be fair.  You've said a lot since then, and so I want to reconcile what you've said since then with your statement that you couldn't be fair. [¶] Let me ask you first just as a bottom line because you've had time to think about it.  Do you think now, as you sit here, if you're selected as a juror you could be fair to both sides? [¶] PROSPECTIVE JUROR: Yeah. [¶] [DEFENSE COUNSEL]: Okay.  And what has changed since you originally said that you couldn't be fair?  [¶] PROSPECTIVE JUROR: I'm a pretty logical person, I like to think.  The part that makes it difficult is my mother was a victim of sexual crime. [¶] [DEFENSE COUNSEL]: Mmm-hmm. [¶] PROSPECTIVE JUROR: So—but I can listen to both sides. [¶] [DEFENSE COUNSEL]: Okay.   And you can hear about allegations and

participate in deliberations? [¶] PROSPECTIVE JUROR: Mmm-hmm. [DEFENSE COUNSEL]: Okay. And you also said that if a child testified, that whatever she says you're just going to go with it. Do you recall—did I get that correctly? [¶] PROSPECTIVE JUROR: Mmm-hmm. [¶] [DEFENSE COUNSEL]: Okay. Is that how you feel? [¶] PROSPECTIVE JUROR: I mean, yeah. I realize it's inconsistent with being fair, but I agree with the gentleman who had to leave that children generally are not—they're not liars. [¶] [DEFENSE COUNSEL]: Okay. And so you just said that that's inconsistent—inconsistent with being fair. Can you tell me more about that? [¶] PROSPECTIVE JUROR: You know, I find this whole process very interesting, the trial process, and I'd like to be part of it. I'm just not so sure this is the best case for me to be on. [¶] [DEFENSE COUNSEL]: Okay. And as the Court has said, that's understandable. But what this specific part of the process is about is talking to you about biases and whether you can put those aside and follow the law that the Court will give to you. [¶] One of the things you'll have to do is judge the witnesses testimony equally. Can you follow the law, or will you favor a child's testimony over any other testimony that you hear? [¶] PROSPECTIVE JUROR: I would probably go more with the child, so I'd give more weight to the child's testimony. [¶] [DEFENSE COUNSEL]: Okay. And so you could not follow the law if it told you to do something other than that? [¶] PROSPECTIVE JUROR: If that's what that means, then yes. [¶] [DEFENSE COUNSEL]: Okay. Is it fair to say, kind of given this particular point, that the prosecution has an edge over the defense? [¶] PROSPECTIVE JUROR: Yeah. [¶] [DEFENSE COUNSEL]: Okay. And so their burden is a little bit less than it might be in a different case in your opinion. [¶] PROSPECTIVE JUROR: Yeah. I would feel like it would be flip-flopped. [¶] [DEFENSE COUNSEL]: Okay. [¶] PROSPECTIVE JUROR: But I know that's not how our system works. [¶] [DEFENSE COUNSEL]: That's okay. As you've heard, we're looking for just honest answers. I don't want you to feel judged or otherwise because you're being honest. [¶] Let me follow up when you said flip-flopped. Do you mean that the burden would rest with the Defense to prove innocence? And is that what you mean? [¶] PROSPECTIVE JUROR: Mmm-hmm. [¶] [DEFENSE COUNSEL]: Okay. Thank you for your candor, Mr. (1611107)."

The prosecutor subsequently had the following exchange with Juror Nos. 1611107 and 1734245: "[PROSECUTOR]: ... So Mr. (1611107) and Mr. (1734245), I'm going to take an unusual step now and argue the Defense position. [¶] You indicated that you're logical. So as you've been instructed by the judge, when you come in here everyone's got to have a playing field that's level. You've both indicated that you're partial to children. Everybody's partial to children. We've got a lot of parents. We've got people who are around kids. We're not asking you not to care about kids. [¶] What we're asking you to do is listen to that child when she gets on the stand and clinically and objectively say did this happen or did this not happen? Sometimes children do lie. Sometimes children are going through a custody battle, and they may say something happened that dad or uncle or mom did something because they want to go and live with the other parent. Sometimes a child might have mental issues, mental disability, and they may have imagined what happened to them. It would be your job to sit and listen and then say, okay, did

United States District Court
Northern District of California

United States District Court
Northern District of California

this child have a motive to lie?  Is this child perhaps going through a custody battle?  We're not asking you not to care; okay?  We're just saying that the brain has to rule the heart. [¶] Given that, do you think you'd be up to the task of doing that, and could you separate out how you feel right now and say, okay, I'm being asked to suspend my beliefs right now and put them aside so I can do this job?  I'm going to start with Mr. (1611107).  Do you think you could do that? [¶] PROSPECTIVE JUROR: Yeah. [¶] [PROSECUTOR]: Is that a yes? [¶] PROSPECTIVE JUROR: Yeah. [¶] [PROSECUTOR]: Okay.  So the judge—as I told you, the burden is on me.  The burden is squarely on my shoulders, no one else's.  Now that I've explained that to you, are you comfortable with that, that the burden's on me and it's not over at that table? [¶] PROSPECTIVE JUROR: I understand. [¶] [PROSECUTOR]: Okay.  Can you follow that law? [¶] (Juror nods head up and down.)"

Defense counsel challenged both Juror Nos. 1611107 and 1734245 for cause: "[DEFENSE COUNSEL]: Okay.  Well, Mr. (1734245) wholly adopted the comments of Mr. (1611107), who's seated at 14, which is that the prosecution would have no burden, that Defense would have the burden of proving innocence.  They both used the words 'flip-flopped.'  The burden would be flip-flopped.  They both said that they would do whatever or they would go with whatever a child witness says.  They both said they would favor the prosecution as a result.  They both said they could be fair. [¶] Mr. (1734245) said that he would be unable to put aside his personal beliefs and follow the law, even if he knew that the law was different than his personal belief specifically as to the burden is the line, that I asked him about that.  So I would challenge Mr. (1734245) on that basis.  And because the comments are so similar, I would also challenge Mr. (1611107) seated in number 14 as well for the same reasons."

The prosecutor responded: "Judge, I think upon the questioning and answers of my voir dire, both Mr. (1734245) and Mr. (1611107) were able to set aside their previous positions and examine the other side of the coin, so to speak.  The examples were given.  They agreed with them. [¶] I then tested them and asked if they could agree the burden's on my shoulders and not on the Defense, and there was in fact a presumption of innocence.  Both men did not waver in their answers and indicated that, yes, they could be fair, and given further explanation, could be fair if seated as a juror on this trial. So I think they both were rehabilitated."

The trial court ruled as follows: "All right.  The Court will note some things that would not be clear on the record in terms of what people said, but I will note both Mr. (1734245) and Mr. (1611107), when being questioned by [the prosecutor], seemed to have the light go on a little bit for the first time being challenged in their thinking in terms of are there reasons someone would lie. [¶] There are challenges that can be made to testimony.  I think as we often find, people may be formulating in their mind, imagining what the testimony will be.  I do think they were rehabilitated.  Indicated that recognizing there are motives to lie, that they would be able to apply those standards, that they will be fair on this case, that they would hold the People to their burden, and I'm going to deny those challenges."

Defense counsel used his final peremptory challenge to excuse prospective Juror No. 1734245, who was replaced on the panel by Juror No. 1611107.   Defense counsel's request for additional peremptory challenges was denied.

2. Legal Analysis

A defendant, who has been accused of a crime, has a federal and state constitutional right to a trial by an impartial jury.  (U.S. Const., 6th and 14th Amends; Cal. Const., art. I, § 16; *In re Hitchings* (1993) 6 Cal.4th 97, 110.)  In *People v. Black* (2014) 58 Cal.4th 912 (*Black*), the California Supreme Court set forth the principles regarding for-cause and peremptory challenges to prospective jurors as a means of ensuring this right under the federal and state constitutions.   "In California, criminal defendants are allowed an unlimited number of challenges to prospective jurors for cause, which the defendants must use before exercising any peremptory challenges. ([Code Civ. Proc.,] § 226.) [¶] Our statutes set forth the requirements for successful challenges to jurors for cause. [Code of Civil Procedure] [s]ection 225, subdivision (b)(1) allows challenges for cause for 'one of the following reasons: [¶] (A) General disqualification—that the juror is disqualified from serving in the action on trial. [¶] (B) Implied bias—as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror,' or '(C) Actual bias—the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.'  As relevant here, [Code of Civil Procedure] section 229, subdivision (f) states that a challenge for cause for a prospective juror's bias addresses '[t]he existence of a state of mind in the juror evincing enmity against, or bias towards, either party.' [Citation.] [¶] Although challenges for cause are constitutionally guaranteed, the right to peremptory challenges is statutory.  (*Ross* [*v. Oklahoma* (1988) ] 487 U.S. [81,] 89.)  *Ross* held that 'the fact that the defendant had to use a peremptory challenge to [cure the court's error in failing to remove a juror for cause] does not mean the Sixth Amendment was violated.'  (*Id*. at p. 88.)  '[P]eremptory challenges are not of constitutional dimension,' but are merely 'a means to achieve the end of an impartial jury.'  (*Ibid*.)  Mere loss of a peremptory challenge does not automatically constitute a violation of the federal constitutional right to a fair trial and impartial jury.  (*Ibid*.)  If no biased or legally incompetent juror served on defendant's jury, the judgment against him does not suffer from a federal constitutional infirmity, even if he had to exercise one or more peremptory challenges to excuse prospective jurors whom the court should have excused for cause.  (*Id*. at pp. 88–91.)"  (*Black*, at pp. 916–917.)

The *Black* court also stated that the state statutory right to peremptory challenges is " 'subject to the requirement that the defendant exercise those challenges to cure erroneous refusals to excuse prospective jurors for cause.' [Citation.]" (*Black*, *supra*, 58 Cal.4th at p. 917.)  Thus, "an erroneous denial of a challenge for cause to one juror is not reversible error when it deprives a defendant only of a peremptory challenge to another juror. [Citations.]"  (*Ibid*.)  The *Black* court concluded: "A defendant must show that the error affected his right to a fair trial and impartial jury.  When a defendant uses peremptory

challenges to excuse prospective jurors who should have been removed for cause, a defendant's right to an impartial jury is affected only when he exhausts his peremptory challenges and an incompetent juror, meaning a juror who should have been removed for cause, sits on the jury that decides the case. [Citation.]"  (*Id.* at p. 920.)

Under both federal and state law, if the trial court properly denied defendant's for-cause challenge to Juror No. 1611107, then it is irrelevant whether the trial court erred in denying his for-cause challenges to prospective Juror Nos. 1565015 and 1734245.  Thus, this court must determine whether the trial court erred in denying defendant's for-cause challenge to Juror No. 1611107.

"A trial court should sustain a challenge for cause when a juror's views would 'prevent or substantially impair' the performance of the juror's duties in accordance with the court's instructions and the juror's oath. [Citations.]  On appeal, we will uphold a trial court's ruling on a challenge for cause by either party 'if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" (*People v. McDermott* (2002) 28 Cal.4th 946, 981–982.)

Here, Juror No. 1611107 made several statements during voir dire indicating that he would be unable to be impartial.  This juror stated: "I think if you put the kid up there and whatever she says, I'm going to go with it because she's the one it happened to allegedly."  The trial court focused on his use of the word "allegedly" and discussed the jurors' role in resolving factual issues and determining whether the prosecution had proven the elements of the charges.  After the trial court asked whether he could fulfill that role, the juror stated that he could.  However, he then added, "For me, it's a little different when it's a kid" and that a close family member had been sexually abused.  He also stated, "I personally don't think I would be fair in my decision."  However, he stated that he could separate out what he knew about that case and "give a fair trial in this case."  In response to defense counsel's questioning, he explained that "the part that makes it difficult is my mother was the victim of a sexual crime."  He also stated that he "realize[d] it's inconsistent with being fair," but he believed that "children generally are ... not liars."  He was unsure whether this was "the best case for [him] to be on."  He asserted that he would "give more weight to the child's testimony."  He agreed that the prosecution had an edge over the defense in this type of case and the burden of proof would be "flip-flopped" even though he knew "that's not how our system works."  However, Juror No. 1611107 made statements indicating that he could be impartial.  After the prosecutor discussed how people are sympathetic to children and the jurors' role in determining the credibility of children as witnesses, she gave examples of situations in which a child might lie about events. The prosecutor then asked Juror No. 1611107 whether he could set aside his feelings about children and determine the credibility of witnesses and give both sides a level playing field.  The juror stated that he could do so.  In response to further questioning, he also stated that he understood that the prosecution had the burden of proof and he could follow that law.

In the present case, Juror No. 1611107 made conflicting statements about his ability to be impartial. However, as the trial court noted in its ruling, "when being questioned by [the prosecutor], [Juror No. 1611107] seemed to have the light go on a little bit for the first time being challenged in [his] thinking in terms of are there reasons someone would lie." The trial court further found that the juror recognized that there were motives to lie, he would be able to apply the requisite standards, would be fair, and would hold the prosecution to its burden. The record supports these findings. Since the trial court properly denied defendant's for-cause challenge to Juror No. 1611107, defendant has failed to show that he was deprived of his federal and state constitutional rights to an impartial jury. [FN2]

[FN2] An appellate court reviews the propriety of a ruling based on the record before the trial court when it ruled (*see generally People v. Soper* (2009) 45 Cal.4th 759, 774). Here, after the trial court denied defendant's for-cause challenge to Juror No. 1611107, the following exchange between the trial court and Juror No. 1611107: "THE COURT: Mr. (1611107), nothing to be alarmed about I didn't want to put you on the spot, but I recognize when I was checking back over my notes, you had indicated you wanted to talk in private. I assume it was about the issue that you raised later about your mother being a victim. But I wanted to give you the opportunity just because I had told you I would. So let me ask you first about that. How did you find out about that, that your mother was a victim? [¶] PROSPECTIVE JUROR: Two ways. One through my dad and the other from her. [¶] THE COURT: Okay. And when did you learn about that, how old were you? [¶] PROSPECTIVE JUROR: It's hard to remember. It was a while ago. [¶] THE COURT: As an adult child—I mean as an adult? [¶] PROSPECTIVE JUROR: Yeah. Probably like a late teen. [¶] THE COURT: Okay. [¶] PROSPECTIVE JUROR: And it was earlier from my dad and later from my mom. [¶] THE COURT: And her situation—was it a family member or someone she knew? [¶] PROSPECTIVE JUROR: It was her father. [¶] THE COURT: And did she ever report that to anyone? [¶] PROSPECTIVE JUROR: Her siblings. [¶] THE COURT: Do you know whether there was ever any action taken, like legal action, ever reported to the authorities? [¶] PROSPECTIVE JUROR: No. [¶] THE COURT: Okay. I know we've been back and forth with you, and I do understand your feelings. And we really do have to kind of take that into account also. We're not looking for an answer on that, but, I mean, do you truly think given the charges in this case that you can listen to—listen to it, now having heard some examples of where a child might lie or situation might be different than you thought, and really evaluate the testimony and make sure that you are fully putting the burden ... beyond a reasonable doubt

28

on the shoulders of the People and assure us you can give the defendant a fair trial in this case? [¶] PROSPECTIVE JUROR: Yes." This exchange between the trial court and Juror No. 1611107 also supports the trial court's finding that this juror would be impartial.

Defendant's reliance on *United States v. Gonzalez* (9th Cir. 2000) 214 F.3d 1109 is misplaced. In *Gonzalez*, the defendant was convicted of conspiracy, cocaine distribution, and money laundering. (*Id.* at p. 1110.) During jury selection, one of the prospective jurors stated that her ex-husband, the father of her young daughter, had used and been involved in cocaine trafficking. (*Ibid.*) His criminal conduct was one of the reasons for their divorce about four years earlier and she stated that this experience was painful. (*Id.* at pp. 1110–1111.) The trial court asked her three times whether she could set aside her personal experience and serve impartially. (*Id.* at p. 1111.) The prospective juror responded each time that she would try. (*Ibid.*) The *Gonzalez* court held that the trial court's error in denying the defendant's for-cause challenge to this juror required reversal. (*Id.* at p. 1114.) In contrast to *Gonzalez*, here, Juror No. 161107 stated that he could separate out what he heard about his mother's case and "give a fair trial in this case." He also answered affirmatively that he could set aside his personal feelings and follow the law.

*Carrero*, 2017 WL 75841, at *3-7.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A prospective juror must be removed for cause if his views or beliefs would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-34 (9th Cir. 1990) (internal quotations omitted).

Federal habeas relief may be granted for a state trial court's failure to strike a juror for cause only when there is no fair support in the record for the trial court's determination that the juror was unbiased. *See Wainwright*, 469 U.S. at 424. The state court's determination of juror impartiality is entitled to a presumption of correctness on federal habeas review. *See id* at 429; *United States v. Alexander*, 48 F.3d 1477, 1484 (9th Cir.) (determination of impartiality particularly within province of trial judge), *cert. denied*, 516 U.S. 878 (1995). A "trial court's contemporaneous assessment of a juror's demeanor, and its bearing on how to interpret or understand the juror's responses, are entitled to substantial deference," as is the trial court's

29

assessment of the situation after reflection and deliberation, such as would occur with review of a formal transcript or recording. *White v. Wheeler*, 577 U.S. 73, 80 (2015).

Here, the trial court rejected defense counsel's challenge to Juror No. 1611107, finding that the juror had not shown an inability to be impartial. The state appellate court affirmed, noting that the record supported the trial court's findings.

The Court recognizes that Juror No. 1611107 made a number of initial statements suggesting at least uncertainty about his ability to be impartial with respect to the testimony of a child witness. *See* Dkt. No. 23-5 at 135-36 (juror said "I'm just not so sure this is the best case for me to be on", suggested that the burden would be "flip-flopped", and suggested that the prosecution would have an edge over the defense). But while many of Juror 1611107's initial responses to questions about his ability to be impartial were equivocal, he later unequivocally confirmed that he understood that the prosecution bore the burden of proof, that he could follow the law on the burden of proof, and that he could suspend his beliefs and objectively evaluate the evidence. *Id.* at 142-45. Equivocal answers do not necessarily require a finding of bias. *See United States v. Gonzalez*, 906 F.3d 784, 797 (9th Cir. 2018) (no actual bias where juror initially expressed reservations about being impartial on an emotional level but after dialogue with trial judge stated she could evaluate the evidence impartially); *Magana v. Credio*, 744 F. App'x 390, 391-92 (9th Cir. 2018) ("Although the juror's answers at voir dire were somewhat equivocal, no clearly established Supreme Court law has declared that equivocal answers require a determination that there is bias."); *Ethier v. Gipson*, 2012 WL 760837, at *5 (C.D. Cal. Jan. 31, 2012) (juror's "equivocal" statements that he could be "somewhat" fair and that he felt "some bias in favor of the prosecution" did not establish bias sufficient to warrant removal for cause), *report and recommendation adopted*, 2012 WL 760833 (C.D. Cal. Mar. 8, 2012).

Following questioning by defense counsel and the prosecutor, the trial court rejected defense counsel's challenge to Juror No. 1611107, finding that the juror had not shown an inability to be impartial. The trial court found that when questioned by the prosecutor, Juror No. 1611107 (and Juror No. 1734245) seemed to have a "light go on a little bit," in that the juror "recognized that there [a]re motives to lie" and that testimony can be challenged. Dkt. No. 23-5 at

United States District Court
Northern District of California

1    149-50.  The judge ultimately found that the juror had been "rehabilitated . . . [and would] be fair

2    on this case . . . [and] hold the People to their burden".  *Id.*  That determination is entitled to

3    deference.  *See Patton v. Yount*, 467 U.S. 1025, 1037-40 (1984) (recognizing that because

4    determination of a juror's bias "is essentially one of credibility, and therefore largely one of

5    demeanor," the trial judge's determination is entitled to "special deference"); *see also Carriger v.*

6    *Stewart*, 132 F.3d 463, 473 (9th Cir. 1997) ("We must defer to the state court's credibility finding

7    unless the finding is not fairly supported by the record considered as a whole.")

8          Importantly, the Court is not charged here with determining as a matter of *de novo* review

9    whether it would have made the exact same call as the trial court did.  Instead, because the case

10   arises under 28 U.S.C. § 2254, the Court only determines whether the decision was contrary to

11   clearly established Supreme Court precedent or based on an unreasonable determination of the

12   facts, which requires, in this instance, a "doubly deferential" review.  *See Wheeler*, 577 U.S. at 78.

13   Considering Juror No. 1611107's answers in their totality, the Court finds that the state courts'

14   affirmance of the denial of Petitioner's cause challenge was not objectively unreasonable.

15   Accordingly, because the state court's decision denying this claim was neither contrary to nor an

16   unreasonable application of Supreme Court precedent or an unreasonable determination of the

17   facts, Petitioner is denied relief on Claim No. 8.

18                   **6.**     **Claim No. 9: Cruel and Unusual Punishment**

19         In Claim No. 9 Petitioner argues that his sentence of 90 years to life consecutive to eight

20   years constitutes cruel and unusual punishment under the Eighth Amendment.  Dkt. No. 1 at 60.

21   The California Supreme Court summarily denied this claim.  The California Court of Appeal

22   rejected this claim as follows:

23           Defendant contends that his sentence of 90 years to life consecutive

24           to an eight-year term violates state and federal constitutional bans
             against cruel and/or unusual punishment.

25           Here, the trial court sentenced defendant to serve: 15 years to life on
             the conviction for oral copulation with a child 10 years of age or

26           younger (§ 288.7, subd. (b)—count 1); consecutive to 15 years to life
             on the convictions for aggravated sexual assault of a child under the

27           age of 14 by oral copulation (§ 269—counts 2, 4, 10); consecutive to
             15 years to life on the conviction for aggravated sexual assault of a

28           child under the age of 14 by sodomy (§ 269—count 6); and

consecutive to 15 years to life on the conviction for aggravated sexual assault of a child under the age of 14 by rape (§ 269—count 8).  The trial court also imposed a consecutive determinate eight-year term on the conviction for lewd or lascivious acts by force or fear (§ 288, subd. (b)(1)—count 12).  The trial court stayed the determinate terms it imposed on the remaining convictions for lewd and lascivious acts by force or fear (§ 288, subd. (b)(1)—counts 3, 5, 7, 9, 11).  Defendant did not object to his sentence on the ground that it constituted cruel and unusual punishment.

1. The California Constitution

Article I, section 17 of the California Constitution states that "[c]ruel or unusual punishment may not be inflicted or excessive fines imposed."  This constitutional proscription is violated when a penalty is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch* ).) [FN] "Whether a particular punishment is disproportionate to the offense is, of course, a question of degree.  The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible.  The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*Id.* at pp. 423–424.) "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment."  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.)

The California Supreme Court has devised a three-prong test for assessing whether punishment is cruel or unusual.  (*Lynch, supra*, 8 Cal.3d at pp. 425–427.)  Courts should consider "the nature of the offense and/or the offender" (*id.* at p. 425), compare the punishment to other punishments imposed by the same jurisdiction for more serious offenses (*id.* at p. 426), and compare the punishment to other punishments imposed by other jurisdictions for the same offense. (*Id.* at p. 427.)  The defendant need not establish the requisite disproportionality in all three respects.  (*People v. Dillon* (1983) 34 Cal.3d 441, 487, fn. 38 (*Dillon* ).) [FN] A defendant bears the burden of establishing that the punishment prescribed for his offense is unconstitutional.  (*People v. King* (1993) 16 Cal.App.4th 567, 572 (*King* ).)

We first consider the nature of the offense and the offender. Regarding the offense, we evaluate "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*Dillon, supra*, 34 Cal.3d at p. 479.)

Here, defendant repeatedly sexually assaulted his daughter, who was

between the ages of 10 and 12, for almost three years. In addition to touching her breasts, defendant forced her to orally copulate him multiple times, orally copulated her on at least three occasions, digitally penetrated her several times, masturbated in front of her, sodomized her, and raped her. A[.] also told the probation officer that she believed that she had "forgotten over 75 percent of the times [defendant] sexually assaulted her." Defendant did not use physical violence against his daughter beyond the violence inherent in the offenses. However, A. feared that he would beat her if she did not comply with his demands or if she told anyone about the sexual assaults. Defendant also took advantage of his position as her father by committing the offenses when they were alone together in the family home.

The consequences of defendant's acts were devastating to his daughter. Rather than protecting her from harm, he inflicted severe and ongoing emotional trauma. In a letter to the court, A. wrote: "When I see myself in the mirror, I can no longer say I look beautiful. Because of the defendant, I have a hard time believing that I am beautiful. Also, I now have severe self-esteem issues and no longer wish to be honest. I am afraid if I tell people who I really am, then they might hurt me just as bad or worse than the defendant has hurt me. [¶] It has become more difficult for me to sleep at night. I have severe night terrors and cannot bring myself to get up some mornings. [¶] I have also been diagnosed with complex PTSD because of the defendant. I have been having difficulty with suicidal thoughts and attempts to harm myself. For the last few months I have been able to resist that urge, but it is a struggle I face that I am not able to handle on my own."

Christine W., with whom A. was living, submitted a letter to the court on behalf of A. and K. She described A.'s posttraumatic stress disorder, including her nightmares, anxiety, and hypervigilance. She noted that A. is afraid at night, feels "broken" and "worthless," and sees a therapist weekly. Ms. W. also described the effect of defendant's misconduct on K.: "... K. has had a difficult time. She grew up in a household with someone that viewed child pornography and was sexually abusive. Although it was not her that suffered the abuse, she has still suffered. She lost her father. She is conflicted. ... How could someone she loves do something so horrible? She is still trying to answer this question."

We next focus on defendant's "individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Dillon*, *supra*, 34 Cal.3d at p. 479.) Here, defendant's prior criminality involved a single misdemeanor conviction for trespassing on government property. However, other factors do not support defendant's position. When defendant committed the charged offenses, he was in his early 30's. He had been married since 1999 and was the father of five children. He had attended college and had been employed as an engineer. Thus, defendant was old enough to know and understand that he was committing very serious offenses and that he was inflicting severe emotional damage on his daughter. As the probation officer observed, "defendant demonstrated a callous disregard for the victim as he sexually abused her for his own sexual gratification."

Based on the extensive period during which defendant committed several aggravated sexual assaults on his young daughter, the extremely damaging effect of his sexual misconduct on her and her sister, and his culpability, defendant's sentence is not "so disproportionate to the crime[s] for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

Defendant relies on the discussion of the first *Lynch* technique in *In re Rodriguez* (1975) 14 Cal.3d 639 (*Rodriguez* ). [FN] Rodriguez is readily distinguishable from the present case.  In that case, the defendant, who had been sentenced to an indeterminate term of one year to life for a single conviction of lewd acts (§ 288) and had served 22 years of his sentence, challenged his sentence as cruel and/or unusual punishment.  (*Rodriguez*, at p. 642.)  The *Rodriguez* court stated that "the method of its commission involved no violence and caused no physical harm to the victim.  The episode lasted only a few minutes.  No weapon was involved and petitioner attempted none of the dangerous offenses sometimes associated with violations of section 288." (*Id*. at pp. 654–655.)  The court also stated that the defendant was 26 years old when the offense was committed, had limited intelligence, was functionally illiterate (*id*. at p. 655), and had been previously arrested for two sex crimes.  (*Id*. at p. 644, fn. 6.)  In contrast to *Rodriguez*, here, defendant was older, well-educated, and had committed several more serious sexual offenses, including oral copulation, rape, and sodomy, in addition to several lewd acts over a period of almost three years.

Since defendant has not attempted to compare his sentence for several sexual offenses with sentences for more serious offenses in California or with punishment for the same offenses in other jurisdictions, he has failed to carry his burden of establishing disproportionality as to the second and third prongs of the *Lynch* test.  (*King*, *supra*, 16 Cal.App.4th at p. 572.)

Noting that he will not be eligible for parole in his lifetime, defendant urges this court to consider *People v. Deloza* (1998) 18 Cal.4th 585. In *Deloza*, the defendant received a prison sentence of more than 100 years to life. (*Id*. at p. 589.)  The case was remanded for resentencing, because the trial court had misunderstood the scope of its discretion to impose concurrent terms.  (*Id*. at p. 600.)  The majority opinion did not consider whether the defendant's sentence constituted cruel and/or unusual punishment.  However, Justice Mosk concurred separately and opined that a sentence "impossible for a human being to serve" was cruel and/or unusual punishment.  (*Id*. at pp. 600–601.) Justice Mosk's comments have no precedential value.  (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.)  We agree with those courts which have rejected the contention that a sentence which could not be served within the defendant's lifetime violates the constitutional bans against cruel and/or unusual punishment.  (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1089; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231.)

2. The Federal Constitution

34

1

2

3

4

5

6

> The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." A punishment is cruel and unusual under the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173; *Ewing v. California* (2003) 538 U.S. 11, 20–21.) The federal constitution "affords no greater protection than the state Constitution ...." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.) Since we have concluded that defendant's sentence does not violate the California Constitution, defendant's federal claim also fails. [FN]

7

*Carrero*, 2017 WL 75841, at *8–10 (footnotes omitted).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The California Court of Appeal's rejection of Petitioner's claim alleging cruel and unusual punishment under the Eighth Amendment was not objectively unreasonable. Only extreme sentences that are grossly disproportionate to the crime violate the Eighth Amendment. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003); *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991). The Eighth Amendment contains a "narrow" proportionality principle, which "does not require strict proportionality." *Graham*, 560 U.S. at 59-60. "[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." *Solem v. Helm*, 463 U.S. 277, 289-90 (1983). A court first determines if an inference of gross disproportionality can be made from a threshold comparison between the gravity of the offense and the severity of the sentence. *Graham*, 560 U.S. at 60. Substantial deference is granted to legislatures' determination of the types and limits of punishments for crimes. *See United States v. Gomez*, 472 F.3d 671, 673-74 (9th Cir. 2006). Generally speaking, "so long as the sentence imposed does not exceed the statutory maximum, it will not be overturned on [E]ighth [A]mendment grounds." *United States v. McDougherty*, 920 F.2d 569, 576 (9th Cir. 1990). Only in the rare circumstance where there is an inference of gross disproportionality does the court compare the sentence at issue with sentences for other offenders in the jurisdiction and for the same crimes in other jurisdictions to determine whether it is cruel and unusual. *Graham*, 560 U.S. at 60.

25

26

27

28

Here, as the state court reasonably concluded, Petitioner's sentence cannot be said to be grossly disproportionate to the crimes of which he was convicted. A review of the record makes clear that Petitioner committed numerous grievous sexual offenses against his young daughter for a period of at least two years. As the state court detailed, the offenses went far beyond touching,

United States District Court
Northern District of California

1   and included forced oral copulation, digital penetration, sodomy, and rape.  As a result of the

2   offenses, A. suffered ongoing fear and extreme emotional trauma.  Thus, as the state appellate

3   court reasonably concluded, Petitioner's sentence is not grossly disproportionate to the severity of

4   the crime.

5        Because the state court's decision denying this claim was neither contrary to nor an

6   unreasonable application of Supreme Court precedent or an unreasonable determination of the

7   facts, Petitioner is denied relief on Claim No. 9.

8                    7.    **Claim No. 4: Cumulative Error**

9        Petitioner contends that the cumulative errors of the claims raised in this petition entitle

10  him to relief.  The California Supreme Court and state appellate court summarily denied this

11  claim.  The state superior court rejected this claim as follows:

12           Petitioner argues that the cumulative effect of errors that occurred at
             trial deprived him of due process. "In examining a claim of
13           cumulative error, the critical question is whether defendant received
             due process and a fair trial.  [Citation.]  A predicate to a claim of
14           cumulative error is a finding of error.  There can be no cumulative
             error if the challenged rulings were not erroneous.  [Citation.]"
15           (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068 (*Sedillo*).)
             "Because we have rejected all of his claims, we perforce reject this
16           contention as well." (*People v. Bolin* (1998) 18 Cal.41th 297, 335.)

17  Dkt. No. 30 at 8.

18       In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

19  the cumulative effect of several errors may still prejudice a defendant so much that his conviction

20  must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing

21  conviction where multiple constitutional errors hindered defendant's efforts to challenge every

22  important element of proof offered by prosecution.)  Cumulative error is more likely to be found

23  prejudicial when the government's case is weak.  *See Thomas v. Hubbard*, 273 F.3d 1164, 1180

24  (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th

25  Cir. 2002) (noting that the only substantial evidence implicating the defendant was the

26  uncorroborated testimony of a person who had both a motive and an opportunity to commit the

27  crime.  However, where there is no single constitutional error, nothing can accumulate to the level

28  of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  Here,

United States District Court
Northern District of California

36

1    Petitioner has failed to demonstrate cumulative error from the claims raised in this Petition.  This

2    claim for habeas relief is DENIED

3                                    **I.        CONCLUSION**

4            For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

5            A certificate of appealability will not issue because reasonable jurists would not "find the

6    district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*,

7    529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the United States

8    Court of Appeals.

9            The Clerk shall enter judgment in favor of Respondent and close the file.

10           **IT IS SO ORDERED.**

11   Dated:   3/11/2022

12

13                                                            *Haywood S. Gill Jr.*

14                                                            HAYWOOD S. GILLIAM, JR.
                                                             United States District Judge